THOMAS MENIFEE AND ANOTHER v. M. C. HAMILTON.

1—The defendant in an action of trespass to try title having at the first trial relied upon one title, he should not have been permitted, at a second trial granted him on appeal to this court, to have set up a new and different title.  The rights of the parties were fixed when the demise was laid.

2—Guardians and tutors of minors, according to the civil law, had power, under the direction of the proper court, to convey the estates of their wards.

3—There must be some presumptions in favor of judicial acts.  Hence in this case it is to be presumed that a judge of the first instance, co-operating in 1835 with a guardian in selling land of a minor, was acting with authority; and that the person recognized in his judicial proceedings as the guardian of the minor was the guardian.

4—This court will not reverse judgments of the District Courts for minor errors, when no substantial injustice has been done.

5—The case of Hamilton v. Menifee, 11 Texas R., 718, cited and referred to as decisive of the validity and locality of the grant in question.

Appeal from Goliad. Tried below before the Hon. James Webb.

This action was instituted as long ago as November 11, 1851, by the appellee, Hamilton. It was a suit of trespass to try title to a league of land in Goliad county, originally granted to Tomas Buentillo. The particulars relating to this original grant, and the questions arising upon it, will be found reported in 11th Texas Reports, 718, in the case of Hamilton v. Menifee, which was an appeal from a first trial of this suit. The present record comes up from the second trial, which was had at the November term (1854) of the District Court of Goliad county, soon after the first judgment was reversed and remanded by this court.

When the suit was remanded to the court below, Barton Peck was allowed to make himself a co-defendant with Menifee, avowing himself to be landlord of the latter. Peck, besides the plea of not guilty, set up the limitation of three years. As title or color of title in support of this defense, he alleged in his plea the following chain of transfer:

" 1. The league of land described in plaintiff's petition was granted to one Tomas Buentillo by the government of Coahuila and Texas, by grant dated the 4th day of August, 1833.

" 2. Francesca Buentillo, who was a daughter of said Tomas Buentillo, by the name of Francesca Uante, sold and conveyed two-thirds of said league of land, being the undivided interest claimed by her as the heir and representative of said Tomas Buentillo (called Tomas Uante, also Tomas Uantez, as well as Tomas Buentillo), and of her mother, both of whom were then deceased, to William R. Hensley, as appears by her deed dated the 11th day of June, 1841.

" 3. William R. Hensley sold and conveyed the said two-thirds of said league to this defendant and his co-defendant, as appears by his deed (the name of his wife being also inserted), bearing date the 27th day of September, 1841.

" 4. Said Francesca Buentillo, by the name of Francesca

Hernandez, wife of Jesus Hernandez, and by the signature for her of the name of Francesco Buentillo, in conjunction with her said husband, made a deed of confirmation of her said former sale to said William R. Hensley, and through him to said Menifee and Peck, as aforesaid, as appears by the deed dated the 18th day of November, 1853, of said Hernandez and wife."

The plea concluded with a fifth head, setting forth the locations made upon the land by the defendants in April, 1848, of certain land certificates. And, by further amendment, a tax title was also pleaded as title or color of title in the defendants.

The new line of defense thus assumed is the attempted new title which calls forth the animadversions of this court, to be found in the opinion.

The plaintiff, Hamilton, claimed to have acquired the Buentillo title through Encarnacion Vasquez, to whom the widow of Buentillo, in conjunction with a judge of the first instance, conveyed the entire league on the 17th of June, 1835, professing in her deed to be acting for herself and in the name of her heirs, successors, and all connected with her. In connection with this deed, the plaintiff introduced the receipt of the judge of the first instance, Jose de los Santos, to Encarnacion Vasquez, purporting that the judge had received from Vasquez twenty-five dollars for account of the inheritance and patrimony of the female child Francesca Buentillo, in a sitis of land which the widow of the deceased Tomas Buentillo had sold to said Vasquez for one hundred and fifty dollars; which receipt was given that the purchaser might have proof, and which bore date June 22d, 1835, a very few days after the date of the deed. There is an admission in the record by the defendants that whatever title Vasquez may have obtained, if any, had vested in the plaintiff, Hamilton.

These facts, in connection with those appearing in the opinion and in the case of Hamilton v. Menifee, 11 Texas, 718, suffice to show how the case stood when submitted to the jury at the Fall term, 1854. There were verdict and judgment

XXXII—31.

for the plaintiff. The defendants moved for a new trial, which was refused, and they appealed.

*S. A. White*, for the appellants.—The first error assigned, although manifest, merits the chief consideration of this court, for it was the foundation of all the others.

The facts show that the plaintiff claims under the widow of the grantee, and that the defendants claim under the heirs at law.

Plaintiff, to support his title, introduced the deed of the widow Rangel, which purports to convey the whole of a league of land, which was granted to her deceased husband during her matrimonial copartnership with him, who left at his death (which was shortly after his grant) three children, two of whom were the children of the widow, and one by a former wife.

The question which determines this suit is, did the widow, in the deed above alluded to, sell, or attempt to sell, the interest of Buentillo's heirs, and if she did, had she the power to sell? And another question connected with this one is, had she (admitting the grant was made during their marriage) any interest in the land as *ganancia*, or which is the same, any interest of her own to sell?

The interest of the plaintiff depends on the answer to these several questions. It is contended, in the first place, that the deed of the widow does not pretend to convey any interest of the heirs of Buentillo; that the deed is for *herself*, and *her* heirs and successors. Even an attempt to convey the interest of the heirs of Buentillo would have required that instrument to have named the interest which it proposed to convey, and to have conveyed it legally would have required the formalities of the civil law. (See 6 Martin Cond. R., 530; 4 Martin Cond., p. 627. Also, Nov. Recop. 1. 13, tit. 20, lib. 10, found in 1 White, p. 117.)

The plaintiff himself, I think, would not contend that the deed of Mrs. Rangel conveyed this interest, and in order to extend the deed to cover that interest, they introduced a

paper, purporting to be a receipt of Juan Antonio de Los Santos to Encarnacion Vasques for twenty-five dollars, the amount due the daughter of Buentillo, by a former wife, for her patrimonial estate. It is attempted to establish the sale to Vasques by virtue of this receipt on the foundation of a judicial sale of the Probate Court, as required by the civil law, to transfer a minor's immovable property. This receipt is the more important inasmuch as it seems to have been the cause of leading the court below into an error, which ran through all his ruling; but which, when calmly considered, amounts to nothing, and should not have been allowed as evidence on the trial. It was objected at the trial that the receipt was a forgery, shown by its face, but the paper, from neglect, is not before this court. I will, therefore, only speak of such objections as are shown by the record. In the first place, the receipt purports to be a receipt for twenty-five dollars for the benefit of Francesca, oldest daughter of Buentillo; it does not connect itself with this or any other contract; but is an isolated thing. The deed of Mrs. Rangel is for the consideration of one hundred and fifty dollars, counted down on the table. There is no reference to the daughter Francesca, or the twenty-five dollars; therefore, if the receipt taken alone is not sufficient to convey the interest of Francesca to Vasques, it is still in her or her assigns, and the receipt makes no part of plaintiff's title, and as the deed by the widow does not speak of conveying the interest of Francesca, the receipt could not be corroborative of that sale—wherefore it should not have been allowed.

But if the right of Francesca and the widow was sold, still the plaintiff has not made out his case, for there were other heirs of Buentillo, whose interest the plaintiff has made no showing for. The deed of Mrs. Rangel, nor the receipt for $25, can, by the most liberal construction, be made to reach this interest. The deed purports to convey a league of land, which the widow claims as the widow of the grantee, without showing by what title she claims; but, in attempting to show

her title, shows that there was an interest in her two children, as heirs of her husband. The interest is not shown to be divested, and must, therefore, be presumed to be still in these heirs or their representatives. This we claim for the defendants, or rather for their heir, Francesca, for it is shown that the widow died long since, and after her, her two sons; wherefore, by operation of law, the half-sister, Francesca, is the heir to the whole of the estate of her father, Buentillo, and the title outstanding against the plaintiff.

I think, from the mere inspection of the papers, that it is clear that the plaintiff has not shown title for more than one-half the league.

I think it equally clear, from the facts shown in the case, and the well known law that governs the gains in a matrimonial copartnership, that the widow Rangel had no interest whatever in the property.

The facts are that Buentillo lived on this land fifty-six years, previous to the date of his title, (1853), that he married his last wife in 1829—(or that his daughter, by the former wife, was seven years of age at the time of the Revolution,) therefore, lived with her between four and five years of the fifty-six. The title or grant shows on its face that it was for forty years' service on the frontier, and if it was for the first forty years, the consideration was made eleven years before his marriage with his last wife, and was, of course, his private property.

The only color of objection to this is, that the grant was made during the last marriage, which, I think, will not avail the plaintiff. Because *ganancia* was, by onerous, and not by lucrative title. (See 1 White, side p. 57.) Then, if *ganancia* is only such property as is gained by the joint labor of the married partners, the former wife was the person entitled to the grant, if it is considered a purchase; but if she was not entitled to the whole of it, it should be divided *pro rata*, in which case the widow would be entitled to about one-eleventh.

But I contend that it was not a purchase, but a gift. If so,

it is very clear that a gift, inheritance, or devise, is not community property. (See 1 White, as *supra.*)

A gift by the king is certainly not community property. (See 6 Martin's R., 630.) Whether this was a gift or a purchase, is not very important; for if by purchase, the consideration was by the former wife; and if a gift, it was not community property. If anything more is necessary to show that this land was the private property of Buentillo at the date of his marriage with his last wife, it may be found in the decisions of this court at the last term, when this same case was before it. It was then a contest between this original grant to Buentillo, and a grant made by the Commissioner of Power's Colony to one Doloris Carvajal. The defect in Buentillo's title was supposed to be that his grant was made in 1833, within the limits of Power's Colony contract, which was dated in 1828, and the commissioner, disregarding the Buentillo title, granted it to the said Doloris. This court held that the Buentillo title was protected under a clause in Power's contract, which says that it was the vacant lands only that were granted to Power, and that all perfect rights should be respected, and if the corresponding titles had not issued, the settlers should apply to the proper officers and obtain them. Now, if this grant was protected by that contract in 1828, it was a perfect right in Buentillo before he married his last wife.

*J. A. & G. W. Paschal,* for the appellee.—It is no ground for a new trial that the verdict may not be satisfactory to this court, or that the proof was contrary, or that the verdict may have been against the weight of the evidence, or that the jury might have found either way. The verdict will not be disturbed unless palpably contrary to evidence. (Long v. Steiger, 8 Texas, 462; Gammage v. Trawick, 19 Texas, 59; Briscoe v. Bronaugh, 1 Texas, 340; Perry v. Robinson, 2 Texas, 491; George v. Lemon, 19 Texas, 152; Cummins v. Rice, 19 Texas, 226; Oliver v. Chapman, 15 Texas, 410; Montgomery v. Culton, 23 Texas, 156; Montgomery v. Nash, 23 Texas, 162;

Stewart v. Hamilton, 19 Texas, 101; Russell v. Mason, 8 Texas, 227; Anderson v. Anderson, 23 Texas, 641; Baldridge v. Gordon, 24 Texas, 288; Davidson v. Edgar, 5 Texas, 492; Legg v. Neil, 2 Texas, 428; Hall v. Hodge, 2 Texas, 323.)

On the interruption of possession by suit, counsel cited Shields v. Boone, 22 Texas, 196, and Chambers v. Shaw, 23 Texas, 169; and that it was not necessary for the plaintiff to file a replication to the plea of limitation, they referred to McCorkle v. Lawrence, 21 Texas, 733; Hall v. Hodge, 2 Texas, 333, and Gouhenant v. Brisbane, 18 Texas, 20.

That Buentillo acquired his grant by onerous title, and as community between him and his last wife, they cited Yates v. Houston, 3 Texas, 433; Edwards v. James, 7 Texas, 372; Maynard v. Soloman, Dallam, 548; Burris v. Wideman, 6 Texas, 232; also Febrero, part 2, book 1, chap. 4, sec. 1, and White's Recapilacion, book 4, chap. 4, sec. 1. Also and particularly the case of Savenant v. Le Breton, 1 La. Rep., 520.

On the presumptions to be indulged to support judicial acts, the following were cited : Hancock v. McKinney, 7 Texas, 384; James v. Edwards, 7 Texas, 372; United States v. Arredondo, 6 Peters, 737; Alexander v. Maverick, 18 Texas, 179; Soye v. McCallister, 18 Texas, 80; Soye v. Maverick, 18 Texas, 100.

*Phillips & Phillips*, also for the appellee.—This cause was before this court at its last term, in January, 1854. The entire chain of title through which the appellee claims the land in controversy, was in evidence on the first trial, and formed a part of the record before the appellate court.

The present appellants had pleaded the general issue and several special pleas, and all their evidence under these pleas was also in the record and before this court at its last term.

Now, we understand the practice of this court to be, that a judgment will not be reversed and a cause remanded, although manifest errors have been committed in the court below, if such judgment is, nevertheless, in accordance with the facts and the law of the case.

The evidence of both parties having been before this court on a judgment in favor of the present appellants, and that judgment having been reversed and the cause remanded, the inference would seem legitimate that this court considered the present appellee entitled to recover.   In the mandate there is no direction for a trial *de novo*, in accordance with the opinion of the court, nor *permission* for the parties to amend their pleadings in the court below, and then to try *de novo*.   The action was trespass to try title.   In what light, then, is the former decision of this court to be viewed?   Are we to consider it a decision on a *part* of the case, when the whole case was before them?   Or, rather, are we not authorized to consider the reversal of the former judgment as a judgment by implication, at least on the validity of our chain of title, and that under the facts and law of the case as then presented, we were entitled to recover the land in controversy?   If so, the trial *de novo* in the court below was irregular.   The court, instead of proceeding to try *de novo*, ought to have entered up judgment for the plaintiff, and awarded a writ of possession.   Not having done so, this court will now enter such judgment as the court below ought to have entered.

But, suppose that the mandate contemplated a new trial, did it authorize an *amendment* of the pleadings?

The statute regulating the action of trespass to try title authorizes a second suit after final judgment on appeal, if brought within twelve months after such final decision.   This court, in its discretion, to secure the *bona fide* rights of the parties, might allow amendments on a new trial under its order, but will it sanction an amendment presenting an *entirely new defense?*   In this case the defendants below, and appellants here, amended and plead a *new title*, not exhibited on the former trial.

The plea under which it might have been introduced, then, was on their own motion stricken out, and the title which the plea was intended to support, was altogether withheld.   On this second trial the plea stricken out before is reinstated by

the amendment, and we now have to contend with a *new defense*, a new *claim* altogether.

It has been decided by this court that a plaintiff may amend, and in his amendment set up a new cause of action, but such course will subject him to the payment of costs. But we recollect of no decision that authorizes a new cause of action to be set up, even on terms, after a decision of the Supreme Court. A defendant can claim no more privileges consistent with his position as a litigant than a plaintiff. Moreover, if such a course be sanctioned as an amendment after an appeal, presenting an entirely new defense, in an action of trespass to try title, a wily party, relying on his trickery to wear out his opponent, rather than on the validity of his title, might by repeated amendments and appeals, virtually secure a dozen trials, instead of the two authorized by the statute. This court has decided that it will not knowingly subject itself to imposition by deciding on fictitious issues, to gratify an idle curiosity; and it would seem equally proper to disallow *experimental* issues to be made up as *feelers*, and gravely to be presented to this court, one after another, for its decision. Such a course would operate as a great hardship on a party out of possession, and anxious to quiet his title to the land he claims. He would thereby be subjected to loss by not being able to enjoy his property, and also to additional expense in meeting the new difficulties of each new experiment imposed upon him. It is for this court now to decide upon the propriety of such a course.

If the amendment setting up the new claim since the decision of the Supreme Court, is not allowable, then the present appellants are here with titles already condemned by that decision.

*Pryor Lea*, for the appellants.—The second principal question involves the title of plaintiff below to the Buentillo land, wherever situated.

The first branch of this inquiry relates to the supposed right

of the widow of Buentillo.    The second branch relates to the rights of his children.

This case was formerly before this court by the style of Hamilton v. Menifee.    (11 Tex. R., 718.)

On that occasion the simple question was, whether there had been any title in Buentillo?    And this court then determined that he had either a legal title or an equivalent equity on the 11th of June, 1828; and this right was declared, in strong terms, to have had superiority over any other, and to have been irresistible, by virtue of the colonial contract of Power and Hewetson, and gubernatorial instructions, and the Mexican decree 128, section 12, and the consequent confirmatory proceedings.    So this title was established beyond future controversy.

But this fixed fact raises the present question, whether the plaintiff below has the Buentillo right in whole or in part?

The affirmative is with Hamilton, the plaintiff below; but his own showing appears to have established the negative.

Hamilton's documentary evidence of title in Buentillo shows that he claimed the benefit of decree 128, section 12, on the ground of frontier defense during fifty-six years; that his claim was recognized by the ayuntamiento, the governor, and the commissioner, in giving a testimonio, without any pecuniary consideration, in confirmation of his right, which had been acquired by forty years of frontier defense, as full payment—which right, moreover, had been recognized by the government in the colonial contract, dated June 11, 1828.    The statement of frontier defense, during fifty-six years was made in Buentillo's petition, dated June 23, 1832; and so the forty years of such defense terminated in 1816, entitling him to the land from that date, for the consideration and on the principles which give him any title.

In connection with Hamilton's documentary evidence of Buentillo's title, Liendo, the witness of Hamilton, making proof for him, testified as follows:  On the 11th of June, 1828, and for sometime afterwards, the next to the last wife

of Buentillo was alive, and she died in giving birth to Francesca; and the child could not have been more than seven years old at the beginning of the Texas revolution, in the autumn of 1835. From this date deduct seven years, and the autumn of 1828 is the earliest period for the death of the former wife. She was living, therefore, some months, at least, after the date of the colonial contract, by which the title of Buentillo was authoritatively and effectively recognized. It was, then, an acquisition—so that the wife then living had in it a community interest; and so that in case of the death of either, the other could obtain subsequently the more formal and confirmatory title—as he did, in fact, after her death. If he had died first, perhaps no person would have questioned her right to obtain, as he did, a more formal testimonio of their previous right. This right consisted of long continued possession, and full compensation by most meritorious services, and an actual grant by force of the colonial contract, which expressly recognized the "existing possessions," and gave a possessory right both against the government and against the empresarios. There was a vital difference between this right and that of an ordinary colonist in advance of his obtaining a testimonio. The latter could not be considered as consummated for any particular place in advance of the possessory testimonio—but the right of Buentillo and wife was consummated on full payment and actual possession, recognized by express contract, and therein confirmed against the government and any other claimant. Here was an effective and preclusive union of possession and right of possession. All that was done subsequently was merely confirmatory, and not creative. And, in all cases of confirmation, the relation goes back to the remotest date. So strong is this principle, that a deed made after suit commenced, confirming a deed made before suit, is admissible evidence of the plaintiff's title. (Simmons v. McKissick, 6 Hump. R., 250.) The date of the final testimonio for Buentillo was not important. Whenever made, such assurance was only another form for the

pre-existing substance—more convenient, but not more effective.

These views are believed to be in harmony with all that has been heretofore decided by this court on kindred subjects—sustaining rights, when actually vested, whatever the form.

And if these views are correct, the mother of Francesca, living at the date of the colonial contract, was entitled to community with her husband Buentillo, and Hamilton has no title under the supposed community of the last and surviving wife.

But on the supposition that the mother of Francesca died before the date of the colonial contract, there was a previous community between Buentillo and his wife, if the property was an actual acquisition—but otherwise, at that date, the entire interest was in Buentillo, then not married, as an acquisition before his last marriage, not subject to community of his last wife—and on such supposition, under either alternative, Hamilton has no right under the supposed community of the widow of Buentillo.

The foregoing views of Buentillo's right arise from such a reading of the opinion of this court in Hamilton v. Menifee, 11 Tex. R., 718, as places the title on the footing of acquisition for valuable consideration, subject to community interests. But the opinion may be construed as asserting a title by gift, which is individual property, not subject to community of interests. (1 White's Rec., side p. 57; 6 Mart. R., 630.) In this construction of the opinion, it would be understood as affirming the merits of Buentillo, as commending him for special favor of the government. And, in this view of the subject, the 12th section of decree 128 would be regarded as authorizing a gift of the land; and the consequent proceedings, as consummating such a title, would confer on the donee a separate and exclusive right. But, on the death of Buentillo, such individual title would go to his children, accepting the inheritance, and no part would go to the widow.

From all the preceding views of the Buentillo title, his

widow could not have any personal right in the property, either of community or of inheritance—and the proof does not indicate any other mode of her obtaining a right.

Hence, Hamilton has no title by virtue of her conveyance of a pretended right in herself.

The second branch of the inquiry as to the title of Hamilton, relates to the rights of Buentillo's children.

Hamilton proved by his witness, Liendo, that Buentillo had two or three children by his last wife, who was such during the years 1830, 1831, 1832, 1833, and became his widow; that the oldest of these children could not be more than four or five years old at the commencement of the Texas revolution in the fall of 1835; that he had another child by his previous wife; that the name of this child was Francesca, who of late was the wife of Jesus Hernandez, and who, at the date of said revolution, could not have been more than seven years old; that soon after her mother's death, she was taken by her grandmother to be reared at San Antonio; that she was returned to her father at Goliad after his last marriage; and that on his death she was again, as before, taken to San Antonio, where she continued to live.

The question is, whether Hamilton has the whole or any part of the rights of these children? And here he holds the affirmative, which must be maintained by legal and adequate proof.

It will be seen hereafter that Hamilton's claim rests on the allegation that the rights of these children were sold when they were minors, the oldest being then under the age of seven years.

To convey the real estate of minors, under the civil or Mexican law, an actual sale must have several requisites, among which are the following: That it should be made by a tutor, constituted and qualified for such a purpose according to law; that it should have a regular judicial authorization of the proper judge; and that it should be by auction. (Escreche, Tutela Tutor; Partidas L., 18, T. 16, p. 6; and L. 60, T. 18, B. 3; Schmidt, 30 to 41, 107–8.)

No evidence was offered to show who was a tutor qualified to sell. Although the widow is called the legal tutor of her own children, yet she was not bound to accept, nor could she act without giving surety, unless appointed by will. As to Francesca, the grandmother was in place of a mother, and the same principles applied.

But the qualified tutorship is necessarily a matter of record, and no other kind of evidence is admissible. Even the destruction of a record does not supercede the necessity for proof of its contents. But it is notorious history that a large portion of the records pertaining to the municipality of Goliad are extant and accessible at San Antonio. The modes of proving a record are various, but the thing itself, in some form, is indispensable, and must be affirmatively shown. Nor can it be supplied by presumption. (1 Green. Ev., § 17; Weatherhead v. Baskerville, 11 How., 329.)

No evidence was offered which tended to show a legal authority to sell. Such authorization is a judicial action of the proper judge, and is a matter of record, in the most strict and technical sense of the terms, involving a determination of delicate questions, with complicated circumstances, and under prescribed restrictions. The whole business of sales by tutors was dependent on judicial investigation and decision on the special circumstances of each case, and the tutor could not sell without such specific authorization, and the authorized tutor was accountable to the judge. Hence, the necessary authorization to sell must be a matter of record, and proof of the record is indispensable, as before shown.

There was no offer of evidence to show that a sale had been made at auction. But this fact, as a matter in pais, might be presumed, if not negatived by proof and if all pre-requisites of record were properly established.

Instead of the evidence, which was essential to show a valid sale of the rights of the children, Hamilton only presented the following evidence to make out such a sale:

1. Hamilton read a deed from Maria Ynez Rangel to Encarnacion Vasques, having sufficiently proved its execution.

2. Hamilton proposed to read a receipt from Jose de los Santos Encarnacion Vasques, on proof, that Santos, at the date of the receipt, was judge of the first instance, at Goliad, and on proof of the signature of Santos and the subscribing witnesses, but without proof that they were either dead or out of the State; and thereupon the receipt was read.

These documents, if legally proved, fail to show a valid sale of the rights of the children for the following reasons:

1. These documents constitute the affirmative, showing on the part of the plaintiff below, and they negative all presumption of a contrary import.

2. By a careful inspection of these documents, it appears that the sale was made of the property as belonging to the widow of her own right, contrary to any profession or form of sale for the children, and without any pretense of conformity with the legal requirements of such a sale.

3. The deed bears date the 17th of June, 1835, and the receipt the 22d of the same month. The latter, instead of improving the character of the individual and private sale of the widow, only shows the absence of any legal proceeding on part of the judge, and his improper participation in a nugatory attempt to dispose of the rights of the children.

WALKER, J.—There is some doubt in the mind of the court as to how far this case should be held to be *res adjudicata*, having been before this court at its January term (1854), and decided in 11th Texas Reports, 718.

One thing—of great importance as the case then stood—was settled, to wit: the validity of the Mexican grant of the land in question to Tomas Buentillo. The controversy is now limited to the question of title as between the parties to this suit, proceeding from the Buentillo grant. The right of the defendants below to claim under locations made with full knowledge of the Buentillo title can avail them nothing, and is inconsis-

tent with their own claim of title under Francesca, the daughter by the third marriage of Buentillo; and we shall give this claim of title no prominence in our decision. The main object of the defendants below in obtaining locations was to aid them in making out possessory title under the limitation laws; and as they did not prove three years continuous and uninterrupted possession in themselves or their grantors, nor any notice to the appellee that they claimed under this title, we will dispose of this branch of the case, also, by saying that neither the title by subsequent locations nor the title by adverse possession can be regarded as good for anything in the case.

Whether this court, by the decision referred to in 11th Texas Reports, intended that the appellant in the case should have judgment and restitution of the premises, or whether the reversal should only operate to give a trial *de novo*, is difficult of determination. If the latter, the court below erred in permitting the defendants to amend their pleadings so as to count upon a new and different title from that set up in the former trial. Were such amendments permitted, there would be no end to an action of trespass to try title. Every time a judgment might be reversed in this court, the parties might go on acquiring new muniments of title and presenting new issues of law and fact, thus effectually abrogating the law giving but two actions of trespass to try title to the same party and for the same subject matter. The defendants, having counted upon the one or the other of two titles inconsistent with each other, on the first trial, should not have been allowed to set up a new and different title upon a second trial. The rights of the parties are fixed when the demise is laid, and they can not be allowed to acquire even good titles *pendente lite*, to defeat an adversary, much less should they be allowed to set up bad ones.

But there are other errors appearing upon this record. We find this very remarkable language used in the charge of the court to the jury. The charge says: "The deed from the widow of Buentillo conveyed all his right to Vasquez, if she

was competent in law to make that conveyance and pass the title. Now, what her rights to the land really were, or what were the rights of her children by Buentillo, or of his child by a former marriage, it is difficult to determine, as there has been no proof on this subject, and no law has been adduced governing those rights; and in the absence of such proof and law it is not unreasonable to presume that she was authorized to make the sale, especially under the sanction and co-operation of the judge as provided, if the jury should believe the receipt purporting to be his to be genuine."

This jury, then, without facts and without law to determine the very impinging questions in the case, were certainly in the dark, and the blind were leading the blind. It was the duty of the court to explain the law, being held to understand it, and the jury should have been told what was the legal standing of the widow and children of Buentillo, and what deeds of theirs were good and what bad in law to pass title. But for the latter part of the quotation, which goes on the doctrine of presumptions rather further than a plaintiff in ejectment would have a right to go, the charge is an impartial one, and it is not obnoxious to criticism for prejudice. The charge was perhaps erroneous in supposing that the widow of Buentillo, by her deed to Vasquez, conveyed all the title of her husband. She might have been perfectly competent in law to convey all her own interest in the land, but not the interests of her husband's children; and yet she might, under the civil law, have been competent to convey both, and from the nature and wording of her deed she appears to have intended this, and this view is further supported by facts and circumstances. The receipt of Jose de los Santos, judge of the first instance at Goliad, to Encarnacion Vasquez, the amount of money paid by Vasquez to Santos as the share of Francesca, are all coroborative of the fact that she, the widow of Buentillo, (known in the deed as Maria Ynez Rangel), at least attempted to convey clear title to the whole of the land to Vasquez. Whether she really and legally did convey such title is much more doubtful.

Much is contended for by counsel, on the score that the land· in question, if ever community property, was such as between· the third wife of Buentillo and himself, and not as between· him and his fourth wife, Maria Ynez Rangel. Admitting this· to be an unsettled question would invest the case with greater doubts than now overhang it; but we think the evidence, at least for the purposes of this case, is sufficiently clear that Buentillo's title was onerous or by purchase, and whatever might have been the inchoate equities in his favor, arising out of long frontier service and pioneer defense, he acquired the title during coverture with his last wife, Mrs. Rangel. This, then, gave Mrs. Rangel one-half the land in her own right, as community property, and each of her children and Francesca were entitled to the third of one-half, or one-sixth of the whole. The consideration for the land paid by Vasquez was one hundred and fifty dollars, one-sixth of which, or twenty-five dollars, was the amount of the money reserved for Francesca by the Judge Santos.

The only title in the defendants below not yet alluded to is that derived from Francesca Dies, dated June 11th, 1841, to William R. Hensley, and the deed from Jesus Hernandez and wife, Francesca Buentillo Hernandez, to Menifee and Peck, the appellants, dated November 18th, 1853, reciting and confirming the former deed to Hensley for two-thirds of the Buentillo league. The validity of this title proceeds upon two assumptions. The first is that the land in controversy was community property between Tomas Buentillo and his third wife, the mother of Francesca; and the second that the conveyance of Francesca's interest by Mrs. Rangel, her step-mother, assisted by the judge, was a nullity. The first of these objections to the title of the appellee is sufficiently explained by the evidence, and has been treated already in this opinion. We have also alluded to the second, but will further say that the evidence is, in our judgment, sufficient to warrant. the jury in finding for the appellee.

XXXII—32

Guardians and tutors of minors by the civil law had power, under the direction of the proper court, to convey the estates of their wards. It is claimed that the grandmother of Francesca was properly her guardian; and there is some plausibility for this claim, but we think it insufficient to overcome the contrary presumption that Mrs. Rangel acted as such, and was so recognized by the judge of the first instance at Goliad. Now, there must be some presumptions in favor of judicial acts. One is that the court did not act without authority, nor would have recognized Mrs. Rangel as the proper guardian, unless she had been such. (See Burris v. Wideman, 6 Texas, 231.) In Alexander's Heirs v. Maverick, 18 Texas, 179, the court say : " It would seem that the probate courts are courts of general jurisdiction over the estates of deceased persons, and that all presumptions are in favor of the regularity of their proceedings, which can not be impeached except for fraud, or by showing that in the instance of that estate the jurisdiction did not attach." Giving, then, the scope of this doctrine to the acts of the court, we think that the title of the appellee was sufficient to support a recovery in ejectment.

There were errors in the court below. Some of them have been alluded to. But this court will not reverse the judgments of the District Court for minor errors, when no substantial injustice has been done to the party seeking to obtain a reversal.

In the case of Hamilton v. Menifee, 11 Texas, all the vexed questions as to the validity and locality of the grant were settled in a most able opinion of the Chief Justice. In this case it matters not whether the lands lie within or without the littoral leagues, or whether within the Powers and Hewetson grant, or within the Refugio Mission grant. These are all questions now *coram non judice*. The case has been one of some difficulty to the court, but after patient and careful examination of the whole matter before us, inclusive of all the very learned briefs and arguments, we can do no otherwise than

confirm the judgment of the District Court, and order restitution of the land described in the judgment below, with costs, to the appellee.

Affirmed.